Andrew M. Calamari
Amelia A. Cottrell
Alexander Vasilescu
Adam S. Grace
Justin A. Alfano
John Lehmann
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Room 400
New York, NY 10281
(212) 336-0178 (Vasilescu)

KUNTZ, J.

FILED
CLERK
2014 SEP 23 PM 2: 33
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JAMES L. SCHMIDT II,

Defendant.

CV 14-5574

14 Civ. _____ ( )

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant James L. Schmidt II ("Defendant"), alleges:

**SUMMARY**

1. This is an action against a lawyer who used his status as an attorney to help insure the success of a scheme to defraud investors. With aggressive boiler room tactics and a network of fake investment firms that used cold callers (the "Cold Callers"), internet advertising and fraudulent websites promising high rates of return and discounted stock prices, Defendant's associates succeeded in luring investors into purchasing securities by sending their money to Defendant.

2. Defendant was a key player in the scheme, who used his status as a lawyer to lend legitimacy to the underlying fraudulent scheme. Defendant's role was to receive wire transfers of investor funds and, unbeknownst to investors, relay the money on to Speight and IST, after deducting a two percent fee for himself. The investors who sent their money to Defendant ended up receiving from Speight and IST counterfeit securities that were not worth the paper they were printed on.

3. At least $2.7 million of investor money flowed through Defendant's account, and he got to keep approximately $54,000 of that money as his fee for acting the part of a legitimate attorney purportedly facilitating securities transactions between the investors and the issuers. When Defendant transferred the balance of the investment funds to Speight or IST, he knew or recklessly disregarded that they would split the funds with the Cold Callers. In other words, Defendant knew or recklessly disregarded that he was facilitating a fraudulent scheme.

## VIOLATIONS

4. By virtue of the conduct alleged herein Defendant, directly or indirectly, singly or in concert, has engaged and is engaging in acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

5. By virtue of the conduct alleged herein Defendant, directly or indirectly, singly or in concert, has engaged and are engaging in acts, practices and courses of business that aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), seeking to restrain and enjoin permanently Defendant from engaging in the acts, practices, and courses of business alleged herein.

7.     The Commission seeks a Final Judgment ordering Defendant to disgorge his ill-gotten gains and to pay prejudgment interest thereon, ordering Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), prohibiting Defendant from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and ordering Defendant to repatriate assets.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.     Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Defendant, directly and indirectly, has made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein, including by the offer and sale and the mailing of securities to residents in this District, and communications with potential and actual investors or scheme participants in this District.

## DEFENDANT

10.     **James L. Schmidt II**, age 55, is an attorney licensed to practice and in good standing in Florida. Defendant resides in Osprey, Florida, and is a sole practitioner with a

principal place of business in Destin, Florida.

## RELATED PERSONS AND ENTITIES

11. **International Stock Transfer, Inc. ("IST")** is a Florida corporation incorporated in 2004, with an office in Palm Beach, Florida. Cecil Franklin Speight is currently the sole owner, officer and director of IST. Since March 22, 2004, IST has been registered with the Commission as a transfer agent. On June 14, 2013, staff in the Commission's Office of Compliance Inspections and Examinations (the "Staff") conducted an examination of IST's business in which IST failed to produce the majority of required records to the Staff. IST subsequently filed a Form TA-W with the Commission, seeking to withdraw its registration as a Transfer Agent. The withdrawal was made effective by the Commission on August 3, 2013.

12. **Cecil Franklin Speight ("Speight")**, age 53, is a resident of West Palm Beach, Florida. Speight is the sole owner, officer, and director of IST. On July 24, 2014, Speight consented to the entry of judgment against him and IST for securities law violations arising out of the conduct alleged in this Complaint in the action captioned *SEC v. Speight*, 14-CV-4435 (ADS) (E.D.N.Y.). At that time, Speight also pleaded guilty to related charges in the parallel criminal action captioned *United States v. Speight*, 14-CR-379 (RRM) (E.D.N.Y.).

## FACTS

### The Fraudulent Scheme

13. Beginning in April 2012, Speight paid for the creation and maintenance of websites for certain bogus unregistered financial advisors, including ACI Private Wealth (also known as ACI Private Client) ("ACI").

14. Once Speight funded the creation of the unregistered purported financial advisory firm's websites, each of those business names was used to sell counterfeit securities to members

of the investing public, including through internet advertising and through "cold calling."

15. Speight, through IST, paid at least hundreds of thousands of dollars of scheme proceeds to the Cold Callers that were responsible for speaking to and selling securities to investors.

16. When the Cold Callers succeeded in making a sale, they would direct investors to wire their money to one of two attorneys, including Defendant, typically by providing investors with wire instructions identifying bank accounts held in the names of the attorneys.

17. Defendant's role in the scheme was to add the appearance of legitimacy to the underlying transactions and conceal from investors that the money they wired to Defendant's account was being misappropriated. Defendant thus knowingly or recklessly engaged in transactions that operated as a fraud or deceit upon investors, and he substantially assisted Speight, IST and the Cold Callers in the fraudulent sale of counterfeit securities.

18. Defendant controlled the bank account identified on the wire instructions provided to investors by the Cold Callers, and Defendant agreed with Speight that his bank account would be used as a pass-through for investor money solicited by the Cold Callers to accounts controlled by Speight.

19. When investors sent their money to Defendant's account, Defendant did not transfer the investors' money to ACI as some investors understood they would. Nor was money sent to the supposed issuers of the securities, as would be expected had the securities been legitimate.

20. Rather than providing any legitimate legal services, Defendant (doing the bidding of Speight) simply acted as a conduit for investor money, obscuring the fact that investor funds were being misappropriated.

21. In exchange for these illicit services, Defendant retained approximately 2% of the investment funds, which he took as a cut directly from funds received from the investors.

22. Defendant then transferred the remainder of the investor money, by either wire or check, into bank accounts held by IST and controlled by Speight.

23. Defendant typically only held investor funds in his account for a matter of days before transferring the balance less fees to bank accounts held by IST and controlled by Speight.

24. In an attempt to avoid raising red flags with his banking institution and alerting criminal or civil regulators, Defendant often broke up funds received from investors into a series of smaller dollar amount wire transfers to IST.

25. Once IST and Speight received the money, they mailed counterfeit securities certificates to the investors.

26. Through the efforts of the Cold Callers who claimed to be affiliated with the entities and websites Speight created and through other means, from at least May 2012 forward, IST received at least $3.3 million in investor monies from the offer and sale of fraudulent securities to over 70 investors. Many of these investors are foreign investors, including residents of the United Kingdom, Australia, Ireland, and New Zealand. At least 11 investors are residents of the United States, including at least two investors who reside within this District.

27. At least $2.7 million of scheme proceeds, contributed by at least 45 investors, flowed through Defendant's bank account from the sale of two different securities.

**The Offer and Sale of Sham "Altmark" Bonds**

28. One of the securities that the Cold Callers sold to investors was a bond that promised a 14% annual rate of return, supposedly issued by a company called Altmark Holdings Limited ("Altmark").

29. Altmark is a Turks & Caicos entity that, since 2007, has created a series of high-yield bonds that have been held, in electronic form, in various accounts of Depository Trust Company ("DTC") participants. During the relevant time period, Altmark made no interest payments through DTC or otherwise to any holders of the electronic Altmark bonds.

30. From at least May 2012 forward, IST and Speight created paper Altmark bond certificates and mailed them to investors who were solicited by the Cold Callers, including individuals who claimed to be affiliated with ACI. The Cold Callers promised the investors that the bonds were low risk and would pay a high rate of return.

31. The paper Altmark bond certificates Speight peddled to investors were counterfeits.

32. IST issued these phony paper certificates as Altmark's transfer agent, and Speight signed the certificates as a director of Altmark even though he was not an Altmark director.

33. Having promised a 14% rate of return, Speight and IST used some limited investor monies to pay purported periodic interest payments. However, in April 2013, IST mailed a letter to investors informing them that Altmark was suspending all interest payments. IST made no further "interest" payments thereafter.

34. Defendant knew or recklessly disregarded facts that would have led any reasonable attorney in his position to conclude that Speight was engaged in the sale of fraudulent securities. For instance, Defendant received complaints from at least six different investors,

including questions about the apparently counterfeit nature of the securities, the lack of interest payments and their inability to contact the Cold Callers. Defendant collaborated with Speight to craft responses to the complaining investors, which he knew or recklessly disregarded were false.

35. Defendant falsely identified himself to complaining investors as a form of "escrow" agent for IST. However, Defendant knew or recklessly disregarded that he was not an escrow agent. Indeed, there was no escrow agreement of any kind with anyone, let alone with the issuer of securities.

36. Defendant also falsely identified himself to complaining investors as a "suspense agent" for IST who operated a "suspense account" that preliminarily received funds from investors while the "compliance department" at IST analyzed whether the potential investors met certain qualifications for investing under federal securities law. This representation was knowingly or recklessly false. IST did not have a compliance department, IST did not provide Defendant with any information indicating that it vetted investor qualifications, and Defendant never returned investor money as non-compliant with federal securities law.

37. Defendant's email responses to investors were often inconsistent with each other, including with respect to Defendant's description of the nature of the underlying seller of the securities (e.g., suggesting to some investors that the bonds were sold directly by the issuer, while telling others that the bonds were sold on the secondary market) and IST's relationship with the Cold Callers (e.g., vouching for ACI as one of IST's "clients" in response to one investor, while telling another investor that IST had no affiliation with ACI).

38. Defendant also received copies of Altmark certificates that bore Speight's signature as a director of the company. Defendant knew Speight was not a director of Altmark.

**The Offer and Sale of Sham "PDL" Securities**

39. Speight and IST also fraudulently offered and sold stock certificates purportedly

issued by a Belize entity called "PDL Portfolio (XIX) Ltd." ("PDL").

40. PDL is a corporate shell, not a real business entity. It never had any legitimate business operations, income producing assets, or employees.

41. Speight signed the certificates as President of PDL, although he knew that PDL was nothing more than a shell and that the investor money used to purchase such certificates would not be used to fund any legitimate PDL business.

42. As with IST's Altmark certificates, the PDL certificates are sham documents and were worthless: they contain an "ID No.," but no CUSIP; the certificates purport to be common stock certificates, but the offering materials inconsistently represent that the "shares" will receive a fixed interest rate of 20%; and the offering materials contain references to "Notes" rather than shares. The offering materials also represent that PDL had registered a global note in the name of a nominee with DTC, but, contrary to the representations in the offering materials, no such PDL note is held by DTC.

43. As with the Altmark scheme, Defendant provided misleading information to investors who complained about their purchases of fake PDL stock. For instance, in May 2013, Defendant falsely told an investor that IST conducted "threshold 'due diligence' and compliance verifications prior to agreeing to act as a transfer / settlement agent" for the PDL stock. Given that PDL is a fictitious entity that was created by Speight using IST funds, Defendant had no basis to make this false representation.

**Speight and IST's Misuse of Investor Monies**

44. IST and Speight misappropriated and did not give issuers investor funds.

45. IST Cold Callers provided investors with wire instructions that directed investors' funds to the Defendant's account.

46. In connection with the offer and sale of Altmark securities, IST and Speight arranged for investors to wire their funds to Defendant's and another attorney's bank accounts.

47. All investor money that came into these two attorney accounts was transferred to IST, except for bank charges and amounts identified as attorney's fees. Monies did not come into IST from any other source besides the two attorney accounts.

48. IST's records show that IST received over $2.7 million from at least 52 investors over approximately a one year time period in connection with the offer and sale of Altmark securities, including at least $2.6 million wired to Defendant's bank account from at least 43 investors. Bank records corroborate that IST received money in approximately the same amount from Defendant during such period.

49. Of the approximately $2.6 million in investor money that IST received from Defendant in connection with the offer and sale of Altmark securities, none was paid to the purported issuer of the securities that were supposedly purchased by investors.

50. IST's records also show that investors wired funds to Defendant's bank account in connection with the offer and sale of PDL securities.

51. IST received from Defendant at least $180,000 of investor money wired to Defendant from at least 2 investors over approximately a one year time period in connection with the offer and sale of PDL securities. Bank records corroborate that IST received money in approximately the same amount from Defendant during such period.

52. Of the $180,000 in investor money that IST received from Defendant in connection with the offer and sale of PDL securities, none was paid to the purported issuer of the securities that were supposedly purchased by investors.

**FIRST CLAIM FOR RELIEF**
**(Violations of Sections 17(a) of the Securities Act)**

53. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 52 of this Complaint.

54. Defendant, directly or indirectly, singly or in concert, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities, acting with the requisite state of mind, (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

55. By engaging in the conduct described above, Defendant has violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

56. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 52 of this Complaint.

57. Defendant, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions,

acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

58. By reason of the foregoing, Defendant has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 140.10b-5, promulgated thereunder.

**THIRD CLAIM FOR RELIEF**
**(Aiding and Abetting Speight and IST's Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder)**

59. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 52 of this Complaint.

60. Speight and IST, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with the offer, purchase, or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person.

61. Defendant knowingly or recklessly substantially assisted Speight and IST's violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

62. By reason of the foregoing, Defendant aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter final judgments against the Defendant granting the following relief:

**I.**

Permanently, restraining and enjoining Defendant, his agents, servants, employees and attorneys and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, and from future violations of and/or aiding and abetting violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

**II.**

Ordering Defendant to disgorge his ill-gotten gains, plus prejudgment interest, and such other and further amount as the Court may find appropriate.

**III.**

Ordering Defendant to a pay civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**IV.**

Permanently barring Defendant from participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78s(d)(6).

**V.**

Such other and further relief as to this Court deems just and proper.

Dated: New York, New York
September 23, 2014

By: ______________________________

Amelia A. Cottrell
Associate Regional Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center, Room 400
New York, NY 10281
(212) 336-0178 (Vasilescu)

Of Counsel:
Andrew M. Calamari
Alexander Vasilescu
Adam S. Grace
Justin A. Alfano
John Lehmann